UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CONNIE FREESE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| vs. | ) | No. 1:18-cv-04016-JMS-MPB |
| | ) | |
| HONDA MANUFACTURING OF INDIANA, LLC, | ) | |
| | ) | |
| *Defendant.* | ) | |

## ORDER

On November 21, 2018, Plaintiff Connie Freese filed a Complaint in the Rush County, Indiana Circuit Court against Honda Manufacturing of Indiana, LLC ("HMIN") alleging that HMIN "failed to accommodate [her] medical condition and discharged her in violation of the Americans with Disabilities Act," as well as "discriminated against [her] on the basis of her age and sex, in violation of the Age Discrimination in Employment Act and of Title VII of the Civil Rights Act." [Filing No. 1-2 at 4-5.]   HMIN removed the case to this Court, and on December 20, 2019, HMIN filed a Motion for Summary Judgment.  [Filing No. 1; Filing No. 31.]  That motion is ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the

materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P.

56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The following factual background is set forth pursuant to the standards outlined in Federal Rule of Civil Procedure 56. *See* Fed. R. Civ. P. 56(a). The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-67 (7th Cir. 2005).

### A. Ms. Freese's Position as Process Associate

HMIN manufactures Honda automobiles at its plant in Greensburg, Indiana. [Filing No. 31-2 at 2.] Ms. Freese worked at the Greensburg plant from July 2011 to November 2017 as a Process Associate in the Body Manufacturing Department. [Filing No. 40-1 at 1; Filing No. 31-3 at 24; Filing No. 31-3 at 40-41.] Process Associates work on assembly lines in one of four departments, and they perform tasks such as stamping, welding, painting, plastic injection molding, sub- and final assembly, testing, and quality assurance. [Filing No. 31-1 at 2.] Each Process Associate is assigned to a small working group and trained on the processes (*i.e.*, tasks) for that particular area of the production line. [Filing No. 31-2 at 3.] Process Associates typically rotate through several processes in a single day so that they can avoid sustaining injuries that occur with repetitive movement and overuse. [Filing No. 31-2 at 3.] HMIN asserts that Process

Associates "typically rotate through at least four different processes in a single day (one process each quarter)." [Filing No. 31-2 at 3.]  However, Ms. Freese contends that the number of processes that Process Associates rotate through is "up to four processes," and "for some period, they might just do two processes.  We might switch every week.  Maybe do two different ones.  It just varied." [Filing No. 31-3 at 25.]  She asserts that in other areas of the plant, employees performed only two or three processes.  [Filing No. 40-1 at 4.]  The team coordinator would decide which processes the Process Associates in each working group did each day, and if an employee did not like a particular process, his or her team coordinator could permit the employee to work a rotation of only two or three processes.  [Filing No. 31-3 at 25; Filing No. 40-1 at 4.]

The job description for Process Associate is as follows:

**Process/Equipment Services Associate**

General tasks a process/equipment services associate may perform during a regular 8 hour work day, 5 days per week, **60 second cycle, 500 cars/day.**

Assemble small to midsize automobiles and automotive parts, upper extremities intensive jobs.

Assembly line, **continuous gripping, fine motor tasks – 2-hour increments.**

Pushing/pulling carts

**Standing continuously – 2 hour increments**

**Potential frequent overhead reaching**

Working around moving equipment such as conveyers and forklifts

Operating machinery such as forklift, overhead cranes and vehicles

Lifting and carrying parts, max 40 lbs

Frequent climbing in and out of vehicles

Bending

Stooping

Squatting

Exposure to dust, oils, loud noises, paint, grease, weld fumes, heat

May work as member of assembly, weld, paint or other group (team) and be assigned different workstations as production needs require or shift from one station to another to reduce fatigue factor

No Process/Equipment Services Associate is guaranteed to perform any, or all of the above duties for any specific time or duration.

[Filing No. 31-2 at 8.]

Ms. Freese worked on the C Line, where Process Associates attached metal parts—such as doors and fenders—to automobiles before they went on to the Paint and Plastics Department. [Filing No. 31-3 at 14; Filing No. 31-5 at 6.]  She was assigned to Zone 3 within the C Line, where she rotated through the following processes: fender install, fender set, fender subassembly, and front end/hood adjust.  [Filing No. 31-3 at 46-47 Filing No. 31-5 at 16-18.]  Those processes involved the following:

- fender install: placing a jig[1] into the front end of the car (at waist level) where the fender is loosely attached, then shooting six bolts into the fender using a bolt gun.  [Filing No. 31-3 at 30-31; Filing No. 31-5 at 17-18.]  HMIN contends that the jig weighs approximately thirty pounds, [Filing No. 31-5 at 18], while Ms. Freese contends it weighs fourteen pounds, as indicated on a label on the jig, [Filing No. 40-1 at 4].

- fender set: getting a fender (weighing six pounds) from a rack by lifting it to waist level, carrying it to the automobile, and setting the fender on the car to be installed.  [Filing No. 31-3 at 34; Filing No. 31-3 at 55; Filing No. 40-1 at 4.]

- fender subassembly: applying adhesive to a piece of metal called a "stiffner" and attaching that to the fender with a rivet gun to add firmness.  [Filing No. 31-3 at 37.]

- front end/hood adjust: raising the hood of the automobile overhead and doing checks and adjustments as necessary, such as checking to ensure the bolts are present and adjusting the gap between the fender and the hood with a wrench.  [Filing No. 31-3 at 33-34; Filing No. 31-5 at 16.]  Ms. Freese asserts that the hood is only lifted to eye level, not overhead.

---

[1] A "jig" is "a device used to maintain mechanically the correct positional relationship between a piece of work and the tool or between parts of work during assembly."  "Jig," Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/jig.

[Filing No. 38 at 8.]  HMIN contends the hood weighs approximately thirty-five pounds, [Filing No. 31-5 at 16], while Ms. Freese contends that it weighs approximately twenty pounds.  [Filing No. 40-1 at 4.]  Two employees work together to lift and lower the hood. [Filing No. 40-1 at 4.]  If adjustments are needed, the Process Associate must hold the hood up with one hand and make adjustments with the other hand, then lower the hood.  [Filing No. 31-3 at 34.]

**B.  HMIN's Policies and Procedures**

HMIN's Equal Employment Opportunity Policy in its Associate Handbook states, in relevant part, that "HMIN will not discriminate or allow discrimination on the basis of . . . disability . . . or any other legally protected characteristic in accordance with applicable law," and "HMIN takes appropriate steps to provide reasonable accommodation upon request to qualified individuals with disabilities so long as doing so does not cause an undue hardship."  [Filing No. 31-1 at 8.]

When an employee informs HMIN that he or she has temporary or permanent restrictions due to a disability, HMIN engages in an interactive process with the employee to determine a reasonable accommodation for the employee, which may include temporarily removing the employee from the required process rotation and assigning him or her to perform one specific process that complies with his or her restrictions.  [Filing No. 31-1 at 3.]  HMIN may also assign the employee to perform "unbudgeted tasks," which are not processes themselves, but are other light-duty tasks that relate to the automobile assembly process.  [Filing No. 31-1 at 3.]  HMIN asserts that neither of these accommodations are permanent, and when an employee is issued permanent restrictions, HMIN works with the four departments to try to find a four-way (at least) process rotation that the employee can perform while still complying with his or her restrictions. [Filing No. 31-1 at 3.]

Another accommodation that HMIN offers is a medical leave of absence to allow an employee time to recover from medical conditions.  [Filing No. 31-1 at 3-4.]  However, HMIN's policy is that when a Process Associate has been on a leave of absence for twelve consecutive months, his or her employment is subject to administrative termination and "the associate may be separated from employment, after HMIN complies with all obligations under the [ADA], if applicable, including, but not limited to, considering reasonable accommodation options for qualified individuals with disabilities."  [Filing No. 31-1 at 4; Filing No. 31-1 at 13-14.]

### C.  Ms. Freese's Injury and Temporary Restrictions

On November 30, 2015, while working on the C Line, Ms. Freese experienced a sharp pain in her right shoulder, and she had difficulty raising her arm.  [Filing No. 31-3 at 50-52.]  She reported her injury to her Team Manager who escorted her to the on-site medical clinic.  [Filing No. 31-3 at 53.]  A medical provider took x-rays, [Filing No. 31-3 at 60], prescribed physical therapy, [Filing No. 31-3 at 60], and issued Ms. Freese temporary restrictions including: no overhead work; no push-pull work; no lifting of more than five pounds; no installing fenders; may continue working the process of front end adjust; may write with right hand; and may work at waist level, [Filing No. 31-4 at 4].  Based on these restrictions, HMIN took Ms. Freese out of her normal process rotation and assigned her to working on front end/hood adjust, as well as "filling in" where needed, such as hanging fenders.  [Filing No. 31-3 at 68-69.]

Ms. Freese participated in physical therapy two or three times per week and was prescribed exercises to do at home.  [Filing No. 31-3 at 69-73.]  By mid-December, she was still working outside of her normal process rotation, performing "unbudgeted tasks" such as checking to make sure all of the bolts were in the car, cutting pieces of putty to be placed in the car, and stocking gloves.  [Filing No. 31-3 at 74-75; Filing No. 31-5 at 14.]  During that time, Ms. Freese still was

not able to reach up with her right arm and she was referred to get an MRI. [Filing No. 31-3 at 75.] On December 14, 2015, she was issued the following temporary restrictions: no overhead work; may work at waist level; no pushing, pulling, or twisting; and, no lifting more than five pounds. [Filing No. 31-4 at 6.] Based on these restrictions, Ms. Freese continued to visually inspect bolts through the end of December. [Filing No. 31-3 at 77.]

### D.  Ms. Freese's Surgery and Initial Leave of Absence

Ms. Freese's MRI showed that she had tendon tears, and she was referred to an orthopedic surgeon. [Filing No. 31-3 at 77-79; Filing No. 31-4 at 7-8.] Ms. Freese's orthopedic surgeon restricted her to doing left-handed work only until her surgery, and she continued to check bolts through January. [Filing No. 31-3 at 84-88.] Ms. Freese underwent surgery on February 2, 2016, and she was granted a twelve-week paid medical leave of absence beginning on that day. [Filing No. 31-3 at 88-90.]

### E.  Ms. Freese's Return to Work with Temporary Restrictions

Ms. Freese returned to work on May 2, 2016, with the following temporary restrictions: no reaching or lifting overhead with the right side; no reaching or lifting overhead; may lift two pounds from the floor to the waist with her right arm occasionally; and, may lift one pound from the floor to the waist with her right arm frequently. [Filing No. 31-3 at 93-96; Filing No. 31-4 at 9.] Based on these restrictions, HMIN placed Ms. Freese in various departments to perform bolt checks. [Filing No. 31-3 at 102-03; Filing. No. 31-5 at 14-15.]

After a follow-up appointment with her orthopedic surgeon on June 22, 2016, Ms. Freese was issued the following temporary restrictions: limited reaching overhead with right side; may lift ten pounds from the waist to the shoulder with her right arm occasionally; may lift ten pounds from the waist to the shoulder frequently; may lift five pounds overhead with her right arm

occasionally; may lift ten pounds from the floor to the waist with her right arm occasionally; may lift ten pounds from the floor to the waist with her right arm frequently; and no extreme reaching. [Filing No. 31-3 at 108-09; Filing No. 31-4 at 10.]   Based on these restrictions, Ms. Freese continued to perform bolt checks and was not rotating among processes.   [Filing No. 31-3 at 109-10; Filing No. 31-3 at 168-70.]

### F.   Ms. Freese's Permanent Restrictions

On August 16, 2016, a physical therapist conducted a Functional Capacity Evaluation on Ms. Freese, [Filing No. 31-3 at 112-15], and, based on the evaluation, Ms. Freese's orthopedic surgeon suggested the following permanent restrictions: lifting forty-five pounds from the floor to the waist occasionally; lifting twenty pounds from the floor to the waist frequently; lifting nine pounds from the floor to the waist constantly; lifting thirty pounds from the waist to the shoulder occasionally; lifting fifteen pounds from the waist to the shoulder frequently; lifting nine pounds from the waist to the shoulder constantly; lifting twenty pounds overhead occasionally; lifting ten pounds overhead frequently; lifting zero pounds overhead constantly; pushing and pulling eighty pounds occasionally, pushing and pulling forty pounds frequently; pushing and pulling zero pounds constantly; and should refrain from repetitive overhead work.  [Filing No. 31-3 at 118-20; Filing No. 31-4 at 11.]

When HMIN's Lead Administrator/Plant Safety Category Responsible Associate, Charla Tate, received Ms. Freese's permanent restrictions, she "began evaluating whether HMIN had any position [Ms.] Freese could perform with or without reasonable accommodation."  [Filing No. 31-6 at 2.]  Ms. Tate contacted supervisors and safety personnel in each of HMIN's four departments to determine if Ms. Freese could work as a Process Associate in any of those areas, with or without reasonable accommodation, and in compliance with her permanent restrictions.  [Filing No. 31-6

at 2-3.] Ms. Tate sent these supervisors and safety personnel Ms. Freese's permanent restrictions and asked if any of the departments were "able to place [Ms. Freese] on a process rotation with these permanent restrictions." [Filing No. 31-6 at 3.]   The supervisors and safety personnel evaluated the processes in their departments, and all determined that "the essential functions of the Process Associate position – in each department – were not compatible with [Ms.] Freese's restrictions." [Filing No. 31-6 at 3.]  Specifically, they each advised Ms. Tate that their department could not accommodate Ms. Freese's restrictions such that she could perform a four-way process rotations for the following reasons:

- Vehicle Quality: restrictions regarding repetitive overhead work and lifting from the waist to the shoulder frequently and constantly could not be accommodated because all Process Associates in that department must be able to lift the hood, which HMIN contends weighed twenty-six pounds at the time.  [Filing No. 31-7 at 2-3.]

- Assembly Frame: restrictions regarding zero pounds constant pushing and pulling, lifting fifteen pounds from the waist to the shoulder frequently, and lifting ten pounds overhead frequently could not be accommodated because all Process Associates in that department "must push and pull carts of car parts constantly to install them on the car, and have the capacity to lift (including overhead) in order to assemble the car's frame." [Filing No. 31-8 at 3.]

- Body Manufacturing: restrictions regarding lifting nine pounds from the waist to the shoulder constantly and pushing and pulling zero pounds could not be accommodated because all Process Associates in that department "must be able to lift, install, and adjust various pieces of the car, including the hood, trunk, and doors and are pushing and pulling on various pieces of the car constantly to ensure proper fit." [Filing No. 31-2 at 3.]

- Paint and Plastics: restrictions regarding overhead work and pushing and pulling forty pounds frequently and zero pounds constantly could not be accommodated because all Process Associates in that department "must be able to move cars manually, push and pull various parts and carts, frequently raise and lower the [hood], trunk, and tailgate, and repetitively reach overhead."  [Filing No. 31-9 at 2-3.]

HMIN notes that although some of the supervisors and safety personnel could identify individual processes that Ms. Freese could perform, they could not identify a four-way process rotation that would comply with her permanent restrictions.  [Filing No. 31-2 at 3-5; Filing No. 31-8 at 3; Filing No. 31-7 at 2-3; Filing No. 31-9 at 2-3.]

Ms. Tate met with Ms. Freese on September 15, 2016 and explained that HMIN was unable to find a placement for her that complied with her restrictions and there was no other position with HMIN for which she was qualified.  [Filing No. 31-6 at 3.]  Accordingly, HMIN offered Ms. Freese, as an accommodation, a leave of absence beginning on September 19, 2016.  [Filing No. 31-6 at 3.]  Ms. Freese was instructed to check in with HMIN monthly to advise whether there were any changes in her restrictions.  [Filing No. 31-6 at 3.]

Over the next several months, Ms. Freese remained in contact with Ms. Tate and her colleagues in the Human Resources department.  [Filing No. 31-6 at 4.]  However, Ms. Freese's permanent restrictions did not change, and accordingly, HMIN continued to extend Ms. Freese's leave of absence each month.  [Filing No. 31-3 at 130; Filing No. 31-4 at 12-13.]  On April 28, 2017, Ms. Tate again contacted the various supervisors and safety personnel in each department to determine whether Ms. Freese could work as a Process Associate with or without an accommodation and in compliance with her restrictions, but the essential functions of the Process

Associate role in each department had not materially changed and were still incompatible with Ms. Freese's permanent restrictions.  [Filing No. 31-6 at 4; Filing No. 31-6 at 22-25.]

### G.  Ms. Freese's Termination, Job Search, and Voluntary Retirement

By September 2017, Ms. Freese had been on a leave of absence for twelve consecutive months, so HMIN's Leave of Absence/Short Term Disability Administrator contacted her to determine whether any changes had been made to her permanent restrictions.  [Filing No. 31-1 at 4.] Ms. Freese advised that there had not been any changes, but she intended to visit her doctor to discuss her restrictions the following month.  [Filing No. 31-1 at 4.]  However, Ms. Freese later advised that she was having trouble getting an appointment with her doctor, so HMIN agreed to extend her leave of absence for a thirteenth month so that she could have time to see her doctor. [Filing No. 31-1 at 4.]  On October 11, 2017, HMIN followed up with Ms. Freese who explained that the orthopedic surgeon would not alter the permanent restrictions based on her previous Functional Capacity Evaluation, and her primary care physician would not change the restrictions because he had not treated her for her shoulder injury.  [Filing No. 31-1 at 4.]  Ms. Freese indicated that she would not get an updated Functional Capacity Evaluation because it would cost her $2,000.00.  [Filing No. 31-1 at 4.]  Based on this information and the fact that Ms. Freese had been on a leave of absence for thirteen consecutive months, HMIN had no information that would suggest that additional leave would alleviate Ms. Freese's permanent restrictions such that she could perform the essential functions of a Process Associate with or without accommodation. [Filing No. 31-1 at 4.]  HMIN advised Ms. Freese of other internal job openings, but she stated that she did not have the minimum qualifications required for those positions.  [Filing No. 31-1 at 4.]  HMIN determined that Ms. Freese's permanent restrictions were incompatible with assembly

line work, and it administratively terminated her employment, effective November 2, 2017.  [Filing No. 31-1 at 4.]

When Ms. Freese was put on a leave of absence in September 2016, she applied for and received unemployment compensation benefits.  [Filing No. 31-3 at 193.]  To remain eligible for unemployment compensation, she searched and applied for several jobs, but she "wasn't really pursuing new employment because [she] was still employed."  [Filing No. 31-3 at 201-205]  The jobs for which she interviewed were either "too far away to make it feasible" or she "wasn't really what they were interested in."  [Filing No. 31-3 at 205-206.]  Ms. Freese ended her job search on April 3, 2017 because "[m]ost of the jobs around were $10 an hour, $12 an hour, and [she] really wasn't interested in starting another career at that point."  [Filing No. 31-3 at 206.]  Her unemployment compensation ended in April 2017 and she stopped searching for jobs at that time, determining that she would retire in January 2018.  [Filing No. 31-3 at 206-07.]  During her leave of absence, Ms. Freese remained fully covered by HMIN's health insurance plan.  [Filing No. 31-3 at 204.]

Ms. Freese planned to keep working at HMIN until 2018 or 2019 when she would retire at the age of sixty-five or sixty-six.  [Filing No. 31-3 at 208-09.]  However, after she was administratively terminated and she stopped receiving the unemployment compensation, she voluntarily retired in January 2018.  [Filing No. 31-3 at 207.]  She states that "if [HMIN] had allowed [her] to return to work [she] would not have retired until [she] turned 66 in 2019."  [Filing No. 40-1 at 8.]

**H.  Evidence Cited in Ms. Freese's Response**

*1.  Ms. Freese's Declaration*

In support of her Response to HMIN's Motion for Summary Judgment, Ms. Freese cites her declaration, wherein she states that when she received her permanent restrictions, she met with her Team Coordinator to discuss them, telling him that she did not think any work she was performing on the C Line violated those restrictions.  [Filing No. 40-1 at 7.]  Her Team Coordinator, Jeff Hulva, agreed with her, and they discussed it with the Team Manager, Doug Dodson, who also agreed that the permanent restrictions did not prevent her from performing any of her previous processes.  [Filing No. 40-1 at 7.]  However, Mr. Dodson wanted to check with a safety coordinator before having Ms. Freese return to her normal process rotation.  [Filing No. 31-1 at 7.]  After Mr. Hulva, Mr. Dodson, and Ms. Freese had this conversation, Mr. Hulva told Ms. Freese to report to work on the C Line the following day.  [Filing No. 40-1 at 7.]

Ms. Freese also states in her declaration that she is able to ride horses, go camping, and take care of her horses (including lifting fifty-pound bags of feed).  [Filing No. 40-1 at 7.]  Although her orthopedic surgeon told her she would never be able to reach her hand behind her back again, she has regained that ability.  [Filing No. 40-1 at 7.]  Ms. Freese states that she "felt strong enough to work at [her] old job and expected to return to working full time in [her] old position."  [Filing No. 40-1 at 7.]

In her declaration, Ms. Freese also challenges certain facts asserted by HMIN and supplies her own explanations of job duties of various positions, stating:

- "Prior to working on the assembly line [HMIN] put [her] through an orientation that included touring the entire plant and observing production in all departments.  [She] underwent several weeks of training that included both classroom lectures and hands-

on demonstration and practice, after which she was shadowed by an experienced employee. . . . Training included taking home and studying the operating standards for various tasks, or 'processes' as they were known at [HMIN], that need to be performed on the assembly line." [Filing No. 40-1 at 1.]

- Bolt check did not require physical strength because Process Associates would just visually check to see if bolts were missing and, if so, mark the areas with magic marker. [Filing No. 40-1 at 3.]

- Employees were not expected to lift and carry parts weighing forty pounds. All employees were instructed that any time they needed to carry something weighing more than fifteen pounds, they were to get help from another employee or use a lift assist— a piece of equipment that is "air powered and operated by pushing a button, much like a video game controller." [Filing No. 40-1 at 4.]

- She would be able to lift the hood of a vehicle to adjust the bolts (as part of the Vehicle Quality area), because at this point in the assembly process, the hood is attached to the body of the automobile with hinges, so it is not dead weight that is being lifted, but is instead like lifting or closing the hood of a finished car. [Filing No. 40-1 at 3-5.]

- She could have worked in the Assembly Frame department because there was not constant pushing and pulling of carts. A cart has many parts on it (it holds sixty fenders) and does not need to be moved until it is empty, which is, at most, about once per hour. Further, the cart is on wheels, moves easily, can be moved by any employee sharing the cart, and only needs to be moved a short distance. [Filing No. 40-1 at 5.]

- The hood weighs approximately twenty pounds and is lifted by two employees working together. Other parts are lifted using a lift assist. No pushing and pulling is required

to install a fender, especially because pushing and pulling on the part at this stage would deform it due to it still being malleable.  [Filing No. 40-1 at 5.]

- An automobile only needs to be pushed by hand once or twice per week and, when it is done, it is placed on a dolly and pushed by several employees working together. [Filing No. 40-1 at 5-6.]

- Inspectors do not constantly push and pull.  Instead, they simply check for imperfections and deformities by sight and touch and use a rub cloth or scratcher pad to fix minor imperfections.  [Filing No. 40-1 at 6.]

- When installing doors in the C-2 area, employees use a lift assist to move the door and two employees work together, one holding the door in place while the other shoots the bolts.  This process does not require constant pushing and pulling because the cart needs to be moved only after ten doors have been installed.  Further, any employee on the team could move the cart, including the Team Coordinator.  [Filing No. 40-1 at 6.]

- During the hood install process, two associates carry the hood that weighs twenty pounds.  This does not involve constant pushing and pulling because the carts have ten hoods and can be refilled by any team member.  [Filing No. 40-1 at 6-7.]

- She could work in the Vehicle Quality department because cars are simply checked to make sure they are ready for the customer.  Employees make any final repairs and only work on approximately twelve cars per day, unlike the dozens of cars per hour that are worked on in the assembly line.  [Filing No. 40-1 at 8.]

- She could perform inspections in the C-4 area, performing checks by sight and touch. Minor imperfections could be easily fixed or marked to be corrected later down the line.  No pushing or pulling is required.  [Filing No. 40-1 at 8.]

16

### 2.  *YouTube Video*

In her declaration, Ms. Freese contends:

> Honda produced a 10 minute video that shows the manufacture of the Honda Civic Sedan at its Greenburg, Indiana plant.  I saw the film crew making this video and it shows some of the people I worked with but I was not in it.  It shows many areas of the plant, including areas that I did not work in and only remember because I was taken to every part of the factory during orientation.  The video can be found on the Internet at https://www.youtube.com/watch?v=KH6uEgVZuIA.  This video is a true and accurate depiction of the assembly line at the Greensburg plant.

[Filing No. 40-1 at 2.]  Ms. Freese then discusses several portions of the video, explaining the work that is being performed by Process Associates.  [Filing No. 40-1 at 2-3.]  Ms. Freese did not list the video in her Preliminary Exhibit List.  [Filing No. 21.]

### 3.  *Declaration of Peggy Howard*

In support of her Response, Ms. Freese submitted a declaration from Peggy Howard, who worked at HMIN's Greensburg, Indiana plant from March 2008 to July 2018.  [Filing No. 40-2 at 1.]  Ms. Howard's Declaration discusses process rotation, how Process Associates moved or lifted heavy objects, and her contention that "[t]here were many jobs in the Interior Department where I worked that would not have violated Connie Freese's medical restrictions."  [Filing No. 40-2 at 1-2.]  Ms. Freese did not list Ms. Howard in her Preliminary Witness List.  [Filing No. 21.]

### III.
#### DISCUSSION

As an initial matter, in her response, Ms. Freese withdraws her claims for age and sex discrimination brought under Title VII of the Civil Rights Act.  [Filing No. 38 at 6.]  Accordingly, HMIN's Motion for Summary Judgment on those claims is **GRANTED**.

#### A.  Threshold Issues

Before the Court can address the merits of this matter, there are procedural and evidentiary issues that the Court must first resolve.

### 1. *Sufficiency of Ms. Freese's Statement of Facts*

In its reply, HMIN notes that: (1) Ms. Freese's Response does not comply with the citation requirements contained in the Court's Practices and Procedures; (2) her "Statement of Material Facts in Dispute" section does not comply with several Local Rules; and (3) some of the facts she alleges are not accompanied by citations to the record evidence. [Filing No. 43 at 2-3.] HMIN argues that the Court should disregard Ms. Freese's Statement of Facts. [Filing No. 43 at 2-3.]

The Court acknowledges that Ms. Freese's counsel did not fully comply with the citation requirements outlined in the Court's Practices and Procedures and several Local Rules, and that some of the facts alleged are not accompanied by citations to the record evidence. The Court cautions Ms. Freese's counsel that it expects him to comply with the procedural rules, especially given the frequency with which he practices here. That said, the Court prefers to rule on the merits of this matter, and accordingly, the Court will consider Ms. Freese's Response and the facts she sets forth that are supported by the record.

### 2. *HMIN's Evidentiary Objections*

HMIN also takes issue with Ms. Freese's reliance on a video found on YouTube, arguing that she has not properly authenticated the video and she is not a "witness with knowledge" because she does not have personal knowledge about the video's production, its upload to YouTube, whether it has been altered, or whether the film crew she saw created this particular video. [Filing No. 43 at 4.] HMIN points out that Ms. Freese did not list the video in her Initial Disclosure or her Preliminary Exhibit List. [Filing No. 43 at 4 n.2.] HMIN also challenges the declaration from Peggy Howard, a former HMIN Process Associate, who Ms. Freese did not disclose to HMIN in her Initial Disclosure, discovery responses, document productions, any depositions, or Preliminary

Witness List.  [Filing No. 43 at 5.]  HMIN argues the Court should disregard the YouTube video and the declaration of Ms. Howard.  [Filing No. 43 at 4-6.]

"If a party fails to provide information or identify a witness [in the Initial Disclosure or during discovery] as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  HMIN cited proper authority for excluding the YouTube video and the declaration of Ms. Howard because they were not listed or disclosed anywhere, and Ms. Freese makes no argument that they were properly disclosed before being presented in support of her Response.  Ms. Freese has not explained why the video and Ms. Howard were not previously disclosed, and consequently, the Court does not have any basis for determining that such omission was substantially justified or is harmless.  Therefore, the Court will exclude the YouTube video[2] and the declaration of Ms. Howard.

HMIN also asserts that Ms. Freese's claim that her "boss," Mr. Hulva, and his "boss," Mr. Dodson, "agreed with her that none of the restrictions prevented her from performing her usual processes on C Line" is problematic because: (1) these statements are inadmissible hearsay; (2) Mr. Hulva was not a manager or supervisor; and (3) Mr. Dodson said that he needed to "check with a safety coordinator" to confirm, demonstrating that he was not authorized to make such a determination.  [Filing No. 43 at 5.]  HMIN argues the Court should exclude the statements of Mr. Hulva and Mr. Dodson.  [Filing No. 43 at 4-6.]

A statement that "is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not

---

[2] The YouTube video may have otherwise been authenticated by Ms. Freese's statements in her declaration, but the Court need not reach that issue because the video was belatedly disclosed.

hearsay.  Fed. R. Evid. 801(d)(2)(D).  This hearsay exception arguably applies to the statements made by Mr. Hulva and Mr. Dodson.  However, as explained more fully below, the Court's decision does not turn on this evidence, and therefore, the Court need not rule on the admissibility of the statements.

Finally, HMIN argues that Ms. Freese has no personal knowledge of the other processes on which she never worked, so the Court should not rely on the descriptions set forth in her declaration of the physical requirements of those processes.  [Filing No. 43 at 6-7.]  However, Ms. Freese's declaration explains that:

> [p]rior to working on the assembly line [HMIN] put [her] through an orientation that included touring the entire plant and observing production in all departments. [She] underwent several weeks of training that included both classroom lectures and hands-on demonstration and practice, after which she was shadowed by an experienced employee. . . .  Training included taking home and studying the operating standards for various tasks, or "processes" as they were known at [HMIN], that need to be performed on the assembly line.

[Filing No. 40-1 at 1.] The Court finds that these statements in Ms. Freese' declaration demonstrate that she has personal knowledge of the various processes that Process Associates do in the Greensburg plant, and the Court will consider Ms. Freese's descriptions of those processes.

### B.  Merits of ADA Claims

Having addressed these procedural and evidentiary issues, the Court now turns to the merits of HMIN's Motion for Summary Judgment.  Ms. Freese brings her remaining claims under the ADA, 42 U.S.C. § 12112, alleging that HMIN discriminated against her on the basis of her disability by failing to accommodate her medical condition and discharging her.  [Filing No. 1.] "The ADA recognizes two types of discrimination: discriminatory discharge and failing to provide reasonable accommodation." *Murawski v. Tri Service, Inc.*, 36 F. Supp. 2d 1041, 1044 (N.D. Ill.

1999) (citing *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996)).  The Court will address each of these discrimination claims separately.

### 1.  Failure to Accommodate

In its Motion for Summary Judgment, HMIN argues that Ms. Freese's failure-to-accommodate claim fails because Ms. Freese is not a qualified individual with a disability, as she is not capable of performing the essential functions of her job as a Process Associate with or without reasonable accommodation.  [Filing No. 32 at 21.]  Specifically, the job functions of pushing and pulling carts of car parts, frequently reaching overhead, and lifting and carrying parts weighing up to forty pounds, are not compatible with her permanent restrictions regarding her ability to push and pull, lift, and perform overhead work.  [Filing No. 32 at 22.]  Moreover, HMIN argues, Ms. Freese's permanent restrictions would prevent her from being able to rotate among at least four processes within an area of a department, so as to eliminate repetitive movement and overuse, and thereby prevent injuries.  [Filing No. 32 at 22.]

HMIN contends that even if Ms. Freese were a qualified individual, her failure-to-accommodate claim fails because HMIN did accommodate her restrictions by providing her with three months of leave after her surgery, temporarily reassigning her and keeping her out of the normal process rotation for several months, and providing her with thirteen consecutive months of leave.  [Filing No. 32 at 23.]  HMIN asserts that it continuously engaged the interactive process with Ms. Freese, but it ultimately determined that there was no process rotation to which Ms. Freese could be assigned, given her permanent restrictions.  [Filing No. 32 at 23-24.]

HMIN argues that Ms. Freese's suggested accommodations are unreasonable because: (1) allowing her to return to her job as a Process Associate would violate her permanent restrictions, [Filing No. 32 at 25]; (2) "trainer" is not a position, but is instead when a Process Associate is

21

assigned to be in "training status" to train a newly hired Process Associate, [Filing No. 32 at 26];

(3) a Process Associate in "training status" still must be able to fulfill all of the essential functions

of the Process Associate position and be able to "step in and assist the trainee in any fashion that

was needed," [Filing No. 32 at 26 (quoting Filing No. 31-5 at 24)]; and (4) the other "jobs" or

"positions" Ms. Freese claims she could have performed are not available to her because they

cannot be performed in a four-way process rotation without violating her permanent restrictions,

[Filing No. 32 at 27].

 HMIN adds that, "to the extent [Ms.] Freese is arguing that there were certain *processes*

she could perform (not within a four-way rotation) and that HMIN should have accommodated her

by assigning her to perform a single, isolated process or task," her argument fails because even

though HMIN initially accommodated Ms. Freese's temporary restrictions by assigning her a

single process or task, that does not mean that HMIN is obligated to do so once her restrictions

became permanent, and doing so would go against the purpose of the four-way process rotation:

preventing injuries from repetitive motions and overuse. [Filing No. 32 at 27-28 (emphasis in

original).] HMIN argues that permanently taking Ms. Freese out of the normal four-way rotation

would harm other Process Associates because "it would require them to spend more time on the

more taxing processes, putting them at risk for injury." [Filing No. 32 at 28.]

 In her response, Ms. Freese argues that HMIN did not reasonably accommodate her

disability because there are two processes in her former Process Associate position that HMIN

concedes she was capable of performing without violating her restrictions—fender set and fender

subassembly—and the other two processes—fender install and front end/hood adjust—do not

require pushing and pulling on the fenders or lifting the hood overhead by herself. [Filing No. 38

at 8.] Ms. Freese argues that when installing the fender, it is set in place and then attached with

bolts—not pushed and pulled.  [Filing No. 38 at 8.]  Further, she argues, the hood is lifted by two

employees working together and only lifted to eye level.  [Filing No. 38 at 8.]  Ms. Freese argues

that she was able to perform a normal four-way rotation in her former department without violating

her permanent restrictions.  [Filing No. 38 at 8.]  Moreover, she contends that "[a]lthough a four-

way rotation is the norm at the Greensburg plan[t], it is not required for every employee."  [Filing

No. 38 at 9.]  She states, "A Team Coordinator would assign employees to a two or four-way

process based on who was working and what tasks needed to be done," and "Team Coordinators

had discretion to allow employees to work a two or three-way process if an employee was unable

to work certain processes, or simply didn't want to do some of them."  [Filing No. 38 at 9.]  Ms.

Freese argues that HMIN could have assigned her to a two-way process as a reasonable

accommodation because HMIN "could and regularly does waive" the four-way process rotation

requirement.  [Filing No. 38 at 9.]  Ms. Freese also challenges HMIN's contentions that the other

positions available—primarily performing inspections and working in Vehicle Quality—would be

too difficult for her, noting the specific characteristics and duties of eight different positions and

explaining how they would not violate her permanent restrictions.  [Filing No. 38 at 10-11.]

     In reply, HMIN challenges Ms. Freese's claim that "[s]ome processes required no physical

strength," [Filing No. 40-1 at 3], arguing that this claim is "incredible, unsupported, and self-

serving," [Filing No. 43 at 1].  HMIN also takes issue with Ms. Freese's contention that she "was

. . . able to perform a normal four-way rotation in her old department without violating her

restrictions," noting that she has not shown that she could perform the fender install or front

end/hood adjust processes without violating her restrictions on constantly lifting nine pounds from

the waist to shoulder height and constantly pushing-pulling zero pounds.  [Filing No. 43 at 9

(quoting Filing No. 38 at 8).]  HMIN contends that lifting and pushing are necessary to install the

fenders on the cars and Ms. Freese could not do these actions due to her lifting and push-pull restrictions. [Filing No. 43 at 10.] As for the front end/hood adjust process, HMIN argues that even if the hood did weigh twenty pounds, as Ms. Freese maintains, and it would be lifted by two people, the lifting of the hood would violate her permanent restriction on lifting nine pounds constantly from her waist to her shoulder because her half would still be ten pounds. [Filing No. 43 at 10-11.] HMIN argues that even if Ms. Freese's descriptions of the processes were true, she still would not be able to perform a four-way process rotation in Zone 3 of the C Line because of her permanent restrictions. [Filing No. 43 at 11.]

HMIN also states that Ms. Freese has failed to: (1) dispute that HMIN accommodated her in several ways, [Filing No. 43 at 8]; (2) establish that HMIN ever waived process rotation entirely and permanently for anyone, [Filing No. 43 at 11-12]; and (3) identify exactly who was permitted to rotate between only two or three processes, why those Process Associates were permitted to do so, or when they did so, [Filing No. 43 at 11-12]. HMIN argues that it was not required to place Ms. Freese in a two-way process rotation, and that "an essential function of the Process Associate position is the ability to rotate between at least four different processes in a single day (one process each quarter) to avoid injuries that occur with repetitive movement and overuse." [Filing No. 43 at 11.] HMIN notes that unbudgeted tasks, such as "bolt check," are not the same as processes and are only assigned to Process Associates as needed and on a temporary basis when they are issued temporary restrictions. [Filing No. 43 at 9.] HMIN asserts that Ms. Freese has not identified any other four-way process rotation within a particular area that she could have performed in compliance with her permanent restrictions, and argues that it was not obligated to "cobble together a four-way process rotation across various areas or [d]epartments to accommodate [Ms.] Freese's purported disability." [Filing No. 43 at 13-14.] HMIN asks the Court to enter summary judgment

24

in its favor on Ms. Freese's failure-to-accommodate claim because "she has failed to identify *any* accommodation that was feasible, reasonable, and compatible with her permanent restrictions," and the law merely requires that HMIN provide Ms. Freese with a reasonable accommodation, as opposed to her preferred accommodation.  [Filing No. 43 at 16 (emphasis in original).]

"The ADA requires employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer.]'" *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013) (alterations in original) (quoting 42 U.S.C. § 12112(b)(5)(A)), *overruled on other grounds*, *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).  A failure-to-accommodate claim requires the plaintiff to show that: "(1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011) (citation and quotation marks omitted).  "[T]he ADA defines the term 'qualified individual' to mean 'an individual who, *with or without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or desires." *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013) (emphasis in original) (quoting 42 U.S.C. § 12111(8)). "After an employee has disclosed that she has a disability, the ADA requires an employer to engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Spruling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (citation and quotation marks omitted).

The parties vigorously dispute whether Ms. Freese is a qualified individual.  According to HMIN, Ms. Freese cannot establish that she is a qualified individual because a four-way process

rotation is an essential function of the Process Associate position, and there is no accommodation that would safely allow her to perform this work in compliance with her permanent restrictions. Ms. Freese contends that there is enough evidence on the record for a reasonable jury to conclude that she could have performed the Process Associate position in different departments with reasonable accommodations and that a less-than-four-way process rotation was such an accommodation.

Ms. Freese's declaration outlines certain processes that a reasonable jury could find complied with her permanent restrictions.  Ms. Freese has also testified that the four-way process was sometimes waived, and Process Associates could be assigned to less than four processes if there was a process they did not want to do.  HMIN attempts to undermine parts of Ms. Freese's declaration, arguing that they are "incredible, unsupported, and self-serving," [Filing No. 43 at 1]. However, this argument entirely ignores and directly contradicts what the Seventh Circuit has "repeatedly emphasized over the past decade"—namely, that "the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (citing *Naverjar v. Iyiola*, 718 F.3d 692, 697 (7th Cir. 2013)); *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010); *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009); *Paz v. Wauconda Healthcare & Rehabilitation Centre, LLC*, 464 F.3d 659, 664-65 (7th Cir. 2006); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004)); *see Navejar*, 718 F.3d at 697 ("[W]e long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'") (citation and quotation marks omitted).  Ms. Freese described the essential functions of the Process Associate job based on her personal knowledge and stated that she could perform them with the

less-than-four-way process rotation accommodation.  Contrary to HMIN's position, the Court is required to consider and credit this evidence at the summary judgment stage.  *See Hill*, 724 F.3d at 967-68 ("[The plaintiff] described the three encounters in his deposition based on his personal knowledge and set forth specific facts and the district court should have considered his statements as evidence.").  The Court finds that Ms. Freese's testimony is sufficient to create a genuine issue of material fact regarding whether she could perform certain processes in various departments and whether a four-way process rotation was an essential function of the Process Associate job.

To be sure, HMIN certainly has produced evidence supporting its position that Ms. Freese's proposed accommodations would not be feasible for various reasons, including harming other employees because "it would require them to spend more time on the more taxing processes, putting them at risk for injury."  [Filing No. 32 at 28.]  But based on Ms. Freese's familiarity with the Process Associate position, she disagrees with HMIN's assessment that a four-way process rotation is required, and her declaration establishes her personal knowledge of the plant operations and raises genuine factual disputes about the processes as described by HMIN, whether she could perform them, and whether she could be accommodated by being allowed to perform two processes instead of four.  Which side has the better case is for a jury to resolve, not the Court at the summary judgment stage.  Accordingly, Ms. Freese's failure-to-accommodate claim may proceed and HMIN's Motion for Summary Judgment on this claim is **DENIED**.

### 2. *Discriminatory Termination*

As for Ms. Freese's discriminatory discharge claim, HMIN contends that Ms. Freese has failed to establish a *prima facie* case of disability discrimination under the ADA because: (1) she cannot show that she is a qualified individual with a disability, and (2) she cannot show that HMIN discriminated against her based on her purported disability.  [Filing No. 32 at 29.]  HMIN

maintains that Ms. Freese's administrative termination was due to her permanent restrictions being incompatible with assembly line work.  [Filing No. 32 at 29.]   Additionally, Ms. Freese has admitted that her supervisors never said anything to her that she found offensive related to her injury, her leaves of absence, or her restrictions.  [Filing No. 32 at 29-30.]

In response, Ms. Freese argues that HMIN "concedes that it terminated [her] because it considered her medical restrictions incompatible with assembly line work," and she argues that she has met all of the elements of a discriminatory discharge claim.  [Filing No. 38 at 13.]

In reply, HMIN argues that Ms. Freese's discriminatory discharge claim fails because Ms. Freese is not a qualified individual due to her not being capable of performing the essential functions of her job with or without reasonable accommodation.  [Filing No. 43 at 17.]   HMIN maintains that it did not terminate Ms. Freese because of her disability (torn rotator cuff), but rather because no reasonable accommodation would allow her to perform the essential functions of the Process Associate position in any department without violating her restrictions and HMIN did not have any other positions available for which she was qualified.  [Filing No. 43 at 18.]

HMIN argues that Ms. Freese's discriminatory discharge claim "is merely a repackaged failure-to-accommodate claim premised on her belief that HMIN should have accommodated her in her preferred way rather than administratively terminating her employment."  [Filing No. 43 at 19.]   Courts in this circuit have recognized that failure-to-accommodate and discriminatory discharge claims can be "inextricably intertwined" and "mirror images" of each other.  *Davis v. Am. Drug Stores, Inc.*, 2003 WL 21149063, at *3 (N.D. Ill. May 19, 2003).   However, "the two types of claims are analyzed differently under the law."  *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999).   "To establish a prima facie ADA claim for discriminatory termination, a plaintiff must show that: '(1) she is disabled within the meaning of the ADA, (2) she

28

is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) she has suffered from an adverse employment decision because of her disability.'" *Martinez v. UHD of Del., Inc.*, 162 F. Supp. 3d 796, 804 (C.D. Ill. 2016) (quoting *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002)).  As explained above, genuine issues of material fact exist regarding whether Ms. Freese is able to perform the essential functions of her job with or without reasonable accommodation—specifically, whether she could perform some of the processes while still complying with her permanent restrictions, whether a four-way process rotation is an essential function of the job, and whether she could perform the essential functions of the Process Associate position with the accommodation of a two-way process rotation.  Therefore, Ms. Freese's discriminatory discharge claim may also proceed, and HMIN's Motion for Summary Judgment on this claim is **DENIED**.

### 3. Limits on Damages

HMIN argues that if Ms. Freese's claims survive summary judgment, her alleged wage damages must be limited in two ways.  [Filing No. 32 at 30.]  The Court will address each in turn.

### a.  Temporal Limitations

First, HMIN argues that Ms. Freese's damages are limited to those arising after April 5, 2017 because she did not file her EEOC Charge until January 30, 2018, barring any claim based on alleged discrimination or failure to accommodate that occurred prior to April 5, 2017 (300 days before the filing of her Charge).  [Filing No. 32 at 30.]

Ms. Freese did not respond to HMIN's argument on this issue.

HMIN emphasizes Ms. Freese lack of response to this issue, and argues that she has waived any claim for damages for any alleged wrongdoing prior to April 5, 2017.  [Filing No. 43 at 19-20.]

Claims for discrimination under the ADA "must be filed 300 days after the alleged unlawful employment practice occurred." *Stepney v. Naperville Sch. Dist.*, 392 F.3d 236, 239 (7th Cir. 2004). Ms. Freese filed her EEOC Charge on January 30, 2018, so the only conduct that could be the subject of her Charge must have taken place after April 5, 2017. Ms. Freese did not respond to HMIN's argument on this issue, and therefore, she has waived any argument that she might have had with respect to her claim for any damages prior to April 5, 2017. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."); *De v. City of Chi.*, 912 F. Supp. 2d 709, 733 (N.D. Ill. 2012) (stating that, if a party does not present an argument concerning why summary judgment should not be entered on a particular claim, "the claim is deemed waived and the nonmoving party will lose the motion") (citations omitted). Ms. Freese indicates that she is seeking wages that were lost while she was on her unpaid leave of absence, which began in September 2016. [Filing No. 31-3 at 211-212.] However, her failure-to-accommodate claim for the period of September 2016 to April 5, 2017 is time-barred. *Stepney*, 392 F.3d at 239. Accordingly, her failure-to-accommodate claim is limited to the time she was on a leave of absence from April 5, 2017 to November 2, 2017 (the date she was terminated), and HMIN's Motion for Summary Judgment on this issue is **GRANTED**.

### b.  Failure to Mitigate

HMIN also argues that Ms. Freese failed to mitigate her damages because she did a minimal-at-best job search simply to "receive unemployment," and that job search ended on April 3, 2017, when she had received the maximum amount of unemployment benefits; she was not interested in starting a different career; and she decided to voluntarily retire. [Filing No. 32 at 31 (quoting Filing No. 31-1 at 189).] Therefore, HMIN argues, the Court should deny Ms. Freese's claims for back and front pay damages and benefits.

Ms. Freese objects to HMIN's contention that she failed to mitigate her damages, noting that she began searching for jobs after she was placed on administrative leave, but that she would have lost her health insurance covered by HMIN if she left HMIN for another job. [Filing No. 38 at 13.] Although she interviewed for several jobs, those potential positions were either located too far away to be feasible for her or they paid far less and offered inferior benefits than HMIN, where she was still technically employed. [Filing No. 38 at 14.] She contends that her decision to retire in January 2018 was made in light of HMIN's termination of her employment and, had HMIN permitted her to remain working, she did not plan to retire until she turned sixty-six in 2019. [Filing No. 38 at 14.] Ms. Freese argues that she mitigated her damages by actively searching for jobs, and HMIN has produced no evidence showing that had she searched harder she would have found employment comparable to her pay and benefits from HMIN. [Filing No. 38 at 14.]

"The employer generally bears the burden of proving a failure to mitigate, which entails showing not only a lack of reasonable diligence but also a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." *Brown v. Smith*, 827 F.3d 609, 616 (7th Cir. 2016) (quotation marks and citation omitted). "The Seventh Circuit has defined 'comparable work' as a position that affords 'virtually identical promotional opportunities, compensation, job responsibilities, working conditions[,] and status' as the previous position." *Moore v. Univ. of Notre Dame*, 22 F. Supp. 2d 896, 906 (N.D. Ind. 1998) (quotation and citation omitted). Additionally, "a claimant has no obligation to accept lesser employment . . . or relocate to a new community." *Id.* (citations omitted). The reasonableness and duration of a job search can depend on the plaintiff's background and individual characteristics. *Id.* (citing *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983) (noting "Older claimants need not exert as much effort as young claimants").

31

The record evidence shows that Ms. Freese applied to numerous jobs during her leave of absence, although she testified that she "wasn't really pursuing new employment because [she] was still employed." [Filing No. 31-3 at 201-205]  She states that the jobs for which she interviewed were either "too far away to make it feasible" or she "wasn't really what they were interested in," and they "were $10 an hour, $12 an hour, and [she] really wasn't interested in starting another career at that point." [Filing No. 31-3 at 205-206.]  This evidence presents an issue of fact regarding whether Ms. Freese failed to mitigate her damages by not accepting any of these jobs. *See Moore*, 22 F. Supp. 2d at 905 (defendant did not meet burden to show claimant failed to mitigate damages when he did not accept another position, noting that that position offered a significantly lower salary). Moreover, the issue of a potential failure to mitigate should take into account Ms. Freese's background and individual characteristics, such as the fact that she was still technically employed at HMIN and was covered by its health insurance during that time and the fact that she was in her sixties and planned to retire soon.  *See id.* (court noted that claimant was sixty-six at the time and "[t]he options available to him are not as great as to those available to someone younger," and because he "is at or near retirement age, it is unlikely he will find comparable employment at the salary level he enjoyed while at Notre Dame").  Another issue of fact regarding reasonable diligence is presented by Ms. Freese's decision to not continue her job search efforts from April 3, 2017 (when her unemployment benefits stopped and she decided that she would retire), through November 2, 2017 (the date of her termination), and to January 1, 2018 (the date that she voluntarily retired).  This presents an issue of fact as to whether these decisions to retire earlier than she would have if she was still employed at HMIN, and to stop searching for comparable employment, were reasonable.  These issues of fact are for the jury to decide at trial,

not the Court at the summary judgment stage.  Accordingly, the Court **DENIES** HMIN's Motion

for Summary Judgment on their affirmative defense that Ms. Freese failed to her mitigate damages.

**IV.**
**CONCLUSION**

The Court finds that fact issues exist regarding whether Ms. Freese is a qualified individual

under the ADA and whether she made reasonable efforts to mitigate her damages.  Those issues

of fact must be decided by the jury, and therefore prevent the entry of summary judgment on those

issues.  For the reasons outlined above, the Court **GRANTS IN PART and DENIES IN PART**

HMIN's Motion for Summary Judgment, [31], as follows:

- **GRANTED** as to Ms. Freese's claims for age and sex discrimination brought under Title VII of the Civil Rights Act.

- **GRANTED** to the extent any claim for damages prior to April 5, 2017 is time-barred;

- **DENIED** as to Ms. Freese's failure-to-accommodate claim;

- **DENIED** as to Ms. Freese's discriminatory discharge claim; and,

- **DENIED** as to HMIN's affirmative defense of failure to mitigate damages.

Date: 6/25/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**